COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-128-CR

ERIC WILLIAMS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

In five issues, appellant Eric Williams appeals his conviction for the capital murder of Chad Brooks (the “deceased”).  We affirm.

BACKGROUND

Appellant was charged with committing capital murder by shooting the deceased with a firearm in the course of committing or attempting to commit a robbery.
(footnote: 2)  He pled not guilty.  The jury found him guilty, the trial court accepted the verdict, and Appellant received an automatic sentence of life imprisonment. 

EVIDENCE

Appellant complains that the evidence was legally and factually insufficient to convict him of capital murder and that the trial court abused its discretion by admitting autopsy photos into evidence.

Accomplice Testimony

In his third issue, Appellant claims that there was insufficient independent evidence to corroborate the accomplice testimony of Keith Weathersby and Kevin Lewis.
(footnote: 3)  Article 38.14 of the code of criminal procedure provides that

[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex. Code Crim. Proc. Ann. 
art. 38.14 (Vernon 2005).  In conducting a sufficiency review under the accomplice-witness rule, we must eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to ascertain if there is any evidence that tends to connect the accused with the commission of the crime.  
Solomon v. State
, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); 
Hernandez v. State
, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997).  “Tendency to connect” rather than rational sufficiency is the standard: the corroborating evidence need not be sufficient by itself to establish guilt beyond a reasonable doubt.  
Solomon
, 49 S.W.3d at 361; 
Cathey v. State
, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), 
cert. denied
, 528 U.S. 1082 (2000).  Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense.  
Cathey
, 992 S.W.2d at 462.  The accomplice-witness rule, a statutorily imposed sufficiency review,
 simply requires that there be other evidence tending to connect the accused to the commission of the offense.  
See id. 
at 462-63; 
see also Herron v. State
, 86 S.W.3d 621, 631-33 (Tex. Crim. App. 2002). 

Corroborative Evidence

Appellant contends that the eyewitness testimony of Shalonda and Shontell Jones was insufficient to corroborate the accomplice testimony.

Shalonda
(footnote: 4) testified that she had been staying with her sister, Shontell, and the deceased in their one bedroom apartment.
(footnote: 5)  On April 28, 2003, Shalonda had been asleep on a love seat, and the deceased had been asleep on the couch when Shontell came home, around 11:30 p.m.  Shalonda testified that all three were asleep when, around 1:30 a.m. on April 29, a loud noise woke her, and three black males ran in, yelling, “Keep your head down,” “Where is the stuff?” and “Where is the shit at?”  She identified Keith and Kevin as two of the men that entered the apartment that night from Exhibits 2 and 3, and identified Appellant in court as the third man.  She testified that one of the men went to the deceased, one went to her sister, and one went to her and that Kevin threw the chenille throw blanket that she had been covered up with over her head, but that she could still see because there were times that the blanket did not cover her.

Shalonda testified that Keith took Shontell into the kitchen and that when she heard the three gun shots, she first thought, “Oh, my God, my sister’s dead, we’re going to die.”  She testified that at the time the shots were fired, her sister was in the kitchen, the deceased was on the couch, and she was on the love seat.  Shalonda testified that she got a good look at Appellant when the blanket moved from the left side of her face, stating, “I saw his face and I thought it was the last face I’d see.”

Shontell, the deceased’s common law wife, testified that when she got home from work after 11 p.m., the deceased was asleep on the long couch, and her sister was asleep on the love seat, and that she joined the deceased on the couch and went to sleep.  She testified that there was a loud noise, and three black men came in, two of whom definitely had guns.  She testified that Appellant pointed a gun at the deceased and shouted, “Show me where it is, where’s the money at, show me now.”  She identified Keith as the man who held a gun on her and testified that she went into the kitchen with him and that he told her to point “to wherever it may be” and then to get face down on the floor.  She testified that she thought they wanted “weed.”  She testified that she heard him looking for things in the cupboard and that then there was a bunch of noise in the living room, followed by the three shots.

Dallas police homicide detective Robert Ermatinger, the lead detective on the case, testified that he showed Shalonda a six-photo lineup and that she identified Appellant as one of the persons in the apartment.  He testified that Shontell had not been shown a photo lineup of Appellant and that she had identified Kevin from a photo lineup but that neither she nor Shalonda were able to identify Keith from a photo lineup.

The paramedic who was at the murder scene and the medical examiner both testified that the deceased suffered multiple gunshot wounds.  Brook Reber, Keith’s girlfriend, testified that she let Keith use her car on the evening of April 28, 2003, that she received a phone call from Appellant the next day, April 29, and that Appellant told her that she needed to report her car as stolen.  She testified that he told her that there were guns in the car with his fingerprints and that Keith had nothing to worry about.  She identified Exhibit 29, a burgundy-colored Impala, as a photograph of her car.

Dallas police officer Frank Della identified Exhibit 29 as a photograph of the vehicle that he followed after hearing the radio call about the shooting and the description of three black males fleeing the scene.  He testified that the vehicle’s rear license plate was covered and that when he initiated his lights to make a traffic stop, the vehicle led him on a high-speed chase.  He and Dallas police officer Byron Guynn, who provided back-up in another vehicle, both testified about the high-speed chase and that one passenger, later identified as Keith, exited the moving vehicle, that they caught the front passenger after the vehicle high-sided a curb, and that the driver escaped.  The Tulsa police officer who served Appellant with a capital murder warrant a year later in Tulsa, Oklahoma, testified that Appellant was going by a different name and had several other aliases linked to him.  The mother of Appellant’s children, Daphanie Moore, and Appellant’s aunt both testified that Appellant, Daphanie, and the children went to Tulsa, Oklahoma, to visit family, on April 29 or April 30, 2003.

Kevin’s mother testified that Appellant told her that “the reason they didn’t catch [him was] because [he] was hiding in the bushes for three hours” and that Kevin did not do anything.  She testified that she understood Appellant to mean that he had shot and killed the deceased when he said, “I had to do what I had to do,” and that when her son called her from the jail, he told her that he had been charged “with capital murder, something that he didn’t do” and that he had told her that someone had been shot and killed.  She testified that Appellant told her that if Kevin “would take the wrap [sic], he would get him a lawyer” and that “he would take care of Kevin if he would just take the blame.”

Officer Guynn inventoried the vehicle at the arrest scene and testified that he found two nine-millimeter semi-automatic pistols inside and secured them in his vehicle without wearing gloves.  The State’s firearms examiner testified that the three fired cartridge cases discovered at the murder scene were fired from one of the pistols recovered from the vehicle.  The guns were swabbed for DNA and processed for fingerprints, but the only fingerprint salvaged was Officer Guynn’s.  Handwashings taken from Keith and Kevin tended to indicate that they did not fire a weapon.

The State’s forensic biologist testified that DNA material gathered from the grip and trigger of the murder weapon did not constitute good samples from which he could get a complete DNA profile.  He performed a comparison between the samples from the murder weapon and the genetic profiles generated by buccal swabs provided by Keith, Kevin, and Appellant and testified that, from the comparison, he could include Appellant as a possible source of the DNA obtained from the sample taken from the trigger, exclude him as a source of DNA obtained from the gun’s grip, and exclude Kevin and Keith as sources of DNA obtained from either of the items.  He testified that a second test run by a different lab showed that it was possible that Appellant could have left DNA on the grip.  The defense expert testified that, with regard to the second lab’s results on the gun’s grip, “I wouldn’t even say that IdentiGene included anybody, honestly,” and that the second lab’s results indicated, with regard to the DNA sample, that either “a lot of people handled that gun.  Because there’s a lot of alleles that, again, represent like it was handed around at a party,” or that there was a serious mishandling of the evidence.

Having eliminated the accomplices’ testimony from our consideration and examined the remaining portions of the record, we conclude that there was  evidence other than the accomplices’ testimony that tended to connect Appellant with the commission of capital murder.  
See Solomon
, 49 S.W.3d at 361.  Even though Shalonda and Shontell did not see Appellant shoot the deceased, their description of the positioning of the three black males in the apartment—that Appellant stood near the deceased, had his gun on the deceased, and demanded money or drugs—as well as Appellant’s flight and escape, the testimony by Brook and Kevin’s mother, other trial testimony, and the physical evidence, all tend to connect Appellant to the capital murder.  
See Cathey
, 992 S.W.2d at 462-63.  Therefore, we overrule Appellant’s third issue.

Legal & Factual Sufficiency

In his fourth issue, Appellant asserts that the evidence was legally and  factually insufficient because “no one credibly placed [Appellant] at the crime scene,” forensic evidence did not link him to the crime scene, and the DNA evidence was inconclusive.  In his fifth issue, he complains that a rational jury would not have convicted him.

Standard Of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 
Tex. Code Crim. Proc. Ann. 
art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  We must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a legal sufficiency review.  
Moff v. State
, 131 S.W.3d 485, 489-90 (Tex. Crim. App. 2004).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.  
Watson
, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”  
Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id.
  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12;
 Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.” 
 Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

Accomplices’ Testimony

Keith admitted that he was the person in Exhibit 2 and identified Kevin in Exhibit 3.  He testified that he drove Brook’s car on April 28 and that Exhibit 29 was a photograph of Brook’s car.  He testified that he was present when the deceased was murdered and about events leading up to the shooting: that he, Appellant, Kevin, and Jason Collins waited at a Whataburger to get some drugs from a Mexican guy and that when the Mexican did not show up, they decided to go to the deceased’s apartment for some marijuana and ecstasy.  He testified that it was Jason’s idea to go to the deceased’s apartment, that Jason drove his own car to the apartment, and that Appellant rode with Jason.
(footnote: 6)
 Keith testified that he, Appellant, and Kevin went into the deceased’s apartment and that Appellant stood in front of the couch the deceased was on and had a gun in his hand.  He testified that there were two girls in the apartment and that one of them went into the kitchen with him; he got a box from the cabinet above the sink, and around the same time as he went into the box, he heard three or four shots fired and ran out the door.  He testified that he, Appellant, and Kevin fled in Brook’s car and that Appellant drove.  Keith testified that Appellant had fired the shots and that when he asked Appellant why he had done it, “[Appellant] said he had to do it.”  Keith further testified that he jumped out while the car was going 35 to 40 miles per hour and started running for home; he was arrested later that evening.  He also testified that he was not on his medication when he was arrested and “was not in [his] right mind.”

Keith testified that he did not have a gun that night, that Appellant had a gun, and that there was also a gun in the trunk of the car.  He testified that he did not order anybody to go into the kitchen or do anything else and that he did not take anything.  His agreement with the district attorney’s office was entered into evidence, as were certified copies of his prior criminal convictions. 

Kevin identified himself in Exhibit 3, Keith in Exhibit 2, and the vehicle in Exhibit 29 as the car in which they fled the scene.  He testified that he and Appellant got into Jason’s car, met Keith, and went to a Whataburger to do a drug deal.  When the dealer did not show up, they went to the deceased’s apartment.  He testified that all four men rode in Brook’s car, that he, Appellant, and Keith went into the apartment, and that Jason stayed with the car.

Kevin testified that Appellant knocked on the door twice, pulled out his gun, kicked the door, and started yelling and screaming and that there were two girls screaming.  He further testified that Appellant yelled, “Get the shit, just get the shit,” and put his knees to the deceased’s back.  He testified that the deceased was on the “long three-seated couch” when they first entered the apartment, and the two girls were on the “two-seater couch.”  He testified that he stood in front of the coffee table and that Keith went to the kitchen with one of the girls.  He also testified that both girls pointed to the entertainment system, to a box sitting there that contained money and drugs, but he later stated that it was just one of the girls, because the other was in the kitchen with Keith.  Kevin testified that when he was almost at the door, he heard three gunshots and that Appellant was behind him with the deceased when he heard the gunshots.  He testified that he gave the money and drugs to Appellant, that Appellant drove from the scene, and that when he got out of the car and started running, he was caught immediately by the police.  Kevin testified that he and Appellant smoked marijuana before going to the deceased’s apartment.

Kevin testified that Appellant was the only one with a gun and that there were no other guns in the car.  He testified that Shalonda did not have a blanket over her head, although she did have a blanket, and that he did not point a gun to her head or force her head down.  His agreement with the district attorney’s office was entered into evidence, as were certified copies of his prior criminal convictions.

Other Evidence

Shalonda testified that when the gunshots were fired, she ran to the kitchen to find her sister and saw the deceased to the right in the doorway, with the bottom half of his body in the apartment and the top half-in and half-out of the apartment, bleeding.  She continued to look for Shontell, who was not in the kitchen; she found Shontell when she came back around through the living room and saw her sister coming from the back of the apartment.  Shalonda testified that their phone was broken and they could not get it back together, so she and Shontell split up and knocked on neighbors’ doors to find someone to call the police.

Shontell testified that after she heard the shots, she ran through the kitchen and then through the bedroom to the patio area, where she saw a newer Taurus-type vehicle with its license plate covered driving away.  She then ran back through the bedroom and the kitchen and found the deceased in the doorway, lying on his side, his shirt bloody and blood coming out of his mouth.  She testified that she called 911 using the phone that was beside him, which she had to put back together, called his parents, and then started running around to her neighbors for help.  She testified that the neighbors told her that they had called the police when they heard the shots, that it was “maybe five minutes until the ambulance got there,” and that the police arrived right after the paramedics.

Shalonda testified that the three men were in the apartment about two or three minutes.  Shontell testified that they were in the apartment approximately three minutes.  Keith testified that they were not in the deceased’s apartment for very long, only “a couple of minutes.”  Kevin testified that it “was a few minutes maybe” and was pretty quick and chaotic.  The paramedic testified that the call came in at 1:34 a.m. on April 29 and it was for gunshot wounds, that the first documented vital sign was at 1:44 a.m., that the patient was on the front porch area, and that there were no signs of life.  The Dallas police officer who was dispatched to the apartment testified that he secured the scene, made sure an ambulance was en route, got information on the suspects, and broadcast it.  He testified that the deceased was still alive when he arrived.  The firearms examiner testified that, based on her analysis, there were two contact-range discharges and one from at least two feet away.  The medical examiner’s testimony confirmed that there had been two contact wounds and one from at least one foot away.

Detective Junius Rucker, Sr., testified that he processed the crime scene, arriving at close to 2:00 a.m. on April 29.  He testified that he photographed everything, including the three shell casings, one bullet fragment, and one copper casing and that Exhibit 76 showed a fired casing that he found on the sofa.  He testified that he did not get any latent prints off the casing.  Detective Rucker testified that marijuana was found in the kitchen and in two baggies in the living room by the stereo and that he processed the following for fingerprints: the lamp in the living room, front door, rear doors, coffee table, sofa, kitchen cabinet, countertop, empty scale box, two metal weights, plastic baby bottle, three spent metal casings, and a metal container but that he did not collect anything for DNA.  He testified that the front door had been kicked in, based on damage to the front door and the fact that “you could tell where it was kicked from, but you couldn’t see any detail in the print itself.”

Kevin’s mother testified that when Appellant told her that Kevin was in the wrong place at the wrong time, “[H]e said, I did it all by myself, he said, because I have to do what I have to do.  He said, my wife’s just had a baby.  I have another baby— . . . .”

Daphanie testified that in April 2003, she and Appellant had a child that was two months old and another that was one year old.  She testified that on April 28, 2003, she and Appellant stayed home and watched television, had pork chops for dinner, and then put the children to bed and went to sleep together.  She testified that the phone rang early the next morning, that Jason was the caller, and that he asked to speak to Appellant.  She testified that they rented a car on April 29 to drive to Tulsa, Oklahoma, to visit Appellant’s family and stayed there for around three months.  She testified that they left around mid-week and that she had not planned on moving at the time they left.

Daphanie testified that Appellant did not work when they lived together and that he did not have any money unless she gave it to him or he got the money from somewhere else.  She testified that she did not know Shalonda or Shontell Jones, Kevin Lewis, or the deceased, but that she did know Keith and Jason.  She testified that she did not know that Appellant was wanted for capital murder until a year later, when he was arrested in April 2004, that she was with Appellant all day on April 29, and that he did not call Brook or come into contact with Mildred Lewis that day.  She testified that she never contacted the district attorney’s office or the police to tell them that Appellant did not commit the crime.  Detective Ermatinger testified that it took a year to serve Appellant with the arrest warrant and that Appellant was arrested in Tulsa, Oklahoma.

Both Shontell and Shalonda testified that Keith wore a red shirt the night he was in the apartment.  However, Officers Della and Guynn testified that the driver of the vehicle wore a red jersey, and Keith testified that Appellant was the driver.  Keith testified that when the police caught him, he was in a white tank top and boxers because his pants came down while he was running and he stepped out of them and kept going.  He testified that his hair had been in braids earlier, but when the police caught him, he had taken the braids out. Officer Della confirmed this, testifying that when he saw Keith bailing out of the car, he was wearing baggy white shorts, a white tank top, and had a cornrow hairstyle, and when he saw him later, at 5:00 a.m., he had longer hair and was wearing boxer shorts.

The DNA evidence at trial was not conclusive due to the poor samples obtained.  It tended to indicate that Appellant could have deposited DNA on the murder weapon’s trigger, but excluded him from depositing the DNA on the weapon’s grip.  The sample excluded both Kevin and Keith.  Jason was not asked to provide DNA and was not compared against the samples.  Jason could not be located at the time of the trial.  Appellant’s court-appointed investigator testified about his attempts to find Jason and stated that, in his opinion, Jason was avoiding service.

The jury heard testimony from the two eyewitnesses and two accomplices that Appellant held a gun on the deceased and demanded money or drugs.  The jury also heard testimony from Brook and Kevin’s mother that placed Appellant at the crime scene and in the vehicle used to flee the scene.  Keith testified that Appellant fired the shots and that Appellant later told him that he had to do it.  Kevin testified that Appellant was behind him with the deceased when he heard the gunshots.  The medical examiner testified that the deceased died from gunshot wounds.  Viewing all the evidence in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that Appellant intentionally or knowingly caused the deceased’s death in the course of committing or attempting to commit a robbery.  
See
 
Tex. Penal Code Ann. 
§§ 19.02(b)(1), 19.03(a)(2); 
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Hampton
, 165 S.W.3d at 693.

Viewing the evidence in a neutral light and giving due deference to the jury’s determination of the weight to be given contradictory testimonial evidence, the evidence was sufficient, even without the DNA evidence, to support the jury’s conclusion that Appellant committed capital murder.  
See Watson
, 204 S.W.3d at 414.  The jury had the opportunity to observe and evaluate the witnesses’ credibility and demeanor and to weigh the evidence presented to them by the State and Appellant’s witnesses.
(footnote: 7)  
See Johnson
, 23 S.W.3d at 8.  Having reviewed the entire record, we cannot say that the evidence is so weak that the jury’s determination was clearly wrong and manifestly unjust or that conflicting evidence so greatly outweighed the evidence supporting the conviction that the jury’s determination was manifestly unjust.  
See Watson
, 204 S.W.3d at 414-15, 417; 
Johnson
, 23 S.W.3d at 11.  We overrule Appellant’s fourth and fifth issues.

ADMISSION OF EVIDENCE

In his first two issues, Appellant complains that the autopsy photos were not relevant and that their admission was more prejudicial than probative.  Of the State’s photographic exhibits that he objected to at trial,
(footnote: 8) Appellant now asserts that Exhibits 50, 52, 54, and 57 through 66 are “unobjectionable;”  therefore, we will only address Exhibits 38, 39, 40, 41, 44, 47, 55, and 56.

Standard Of Review

We review a trial court’s decision to admit evidence under an abuse of discretion standard.  
Green v. State
, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996) 
cert. denied,
 520 U.S. 1200 (1997); 
Montgomery v. State
, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh’g).  As long as the trial court’s ruling falls within the zone of reasonable disagreement, we will affirm its decision.  
Moses v. State
, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).  The trial court’s decision must be reasonable in view of all the relevant facts.  
Santellan v. State
, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).  The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Manning v. State
, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003).

Exhibits 38, 39, 40, 41, 44, 47, 55, & 56

During trial, the State sought to admit Exhibits 37 through 67, photographs taken during the deceased’s autopsy.  Appellant objected to all of them and requested a rule 403 hearing, arguing that he did not “really see how the relevance substantially outweighs [the photographs’] prejudicial effect” because cause of death “really isn’t disputed in this case.”  The State withdrew Exhibits 37, 42, 43, 45, 46, 48, 49, 51, and 53, and Appellant objected to all of the remaining exhibits, complaining that they were prejudicial and “have very low relevance and very high prejudicial effect.”  The trial court overruled this objection.  It admitted all of the remaining exhibits except Exhibit 67.

Preservation Of Error

In his first issue, Appellant complains that the autopsy photos were neither relevant nor necessary to assist the medical examiner in describing the cause of death or any issue related to Appellant’s guilt or innocence.  To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  
Tex. R. Evid. 
103(a); 
Tex. R. App. 
P. 33.1(a)(1); 
Mosley v. State
, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court’s refusal to rule.  
Tex. R. App. P
. 33.1(a)(2); 
Mendez v. State
, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004); 
Gutierrez v. State
, 36 S.W.3d 509, 510-11 (Tex. Crim. App. 2001); 
Darty v. State
, 709 S.W.2d 652, 655 (Tex. Crim. App. 1986). 

During trial, Appellant objected that the prejudice of the photographic exhibits substantially outweighed their relevance, a proper rule 403 objection, but he did not object to the relevance of the exhibits themselves, other than to state that the exhibits had “very low relevance.”  Appellant did not object to the trial court that the exhibits lacked any probative value under rule 401, that is, that they were not relevant at all, as he now contends on appeal.  Therefore, he has failed to preserve this complaint for our review.  
Tex. R. Evid. 
103(a), 401; 
Tex. R. App. 
P. 33.1(a)(1)-(2); 
Mendez
, 138 S.W.3d at 341; 
Mosley
, 983 S.W.2d at 265.  We overrule Appellant’s first issue.

Medical Examiner’s Testimony & Rule 403

Dr. William Rohr, M.D., the medical examiner, testified that he performed a forensic autopsy on the deceased.  Twenty-one photos related to the autopsy were admitted into evidence; eleven pertained to the deceased’s corpse.  Dr. Rohr testified that, based on his training and experience and the autopsy, the cause of death was multiple gunshot wounds and the manner of death was a homicide.

Dr. Rohr labeled the three gunshot wounds as #1, #2, and #3, and discussed each.
(footnote: 9)  He testified that based on his examination of the clothing that the deceased had worn and gunshot wound #1, the right shoulder gunshot wound, “[t]he muzzle of the gun was up against the clothing, pressed against the skin,” because of soot and gunpowder inside the wound at the entry site and the holes in the clothing.  He testified that gunshot wound #2, from the bullet that entered through the deceased’s lower left back and exited from his lower left chest, was also a contact wound.  He testified that soot inside the wound meant that “the muzzle of the gun was placed directly up against the skin.”  He testified that gunshot wound #3, from the bullet that entered the deceased’s lower right back and exited on the left, was probably from at least a foot away and caused significant damage—it “literally [broke] the right kidney in half,” severed the renal artery, and went through the stomach and the left lobe of the liver before exiting through the chest wall.

Dr. Rohr testified that Exhibit 38, a photograph of the side of the deceased’s face, showed a small abrasion on his eyebrow that the deceased could have sustained from falling down and that Exhibit 39, a photograph of the deceased’s neck and chest, showed abrading on the left side sustained at or near death. He testified that Exhibit 40, a photograph of the back of the deceased’s naked body on the autopsy table, was “a routine photograph without clothing,” a photograph “routinely taken in all homicides of the back” and displayed the entry wounds of gunshot wounds #2 and #3.  Dr. Rohr testified that Exhibit 41, a photograph of the front of the deceased’s naked body on the autopsy table, was also “a routine photograph of the upper half of the deceased” and displayed the exit wounds of gunshot wounds #1 and #3.  He testified that the chest tubes had been left in place “mainly to kind of make the photograph as clear as possible.”

Dr. Rohr testified that Exhibit 44, a close up of the entry wound of gunshot wound #1 in the deceased’s shoulder, showed soot “in the wound and at the edges” and an abrasion where the gun’s muzzle had been.  He testified that Exhibit 47, another closeup, showed the entry wound of gunshot wound #2, the muzzle imprint and a patch of soot.  Dr. Rohr testified about Exhibit 55, a photograph of the deceased’s kidney, stating, “You can see, as I described before, it’s broken in half by the bullet, and that’s from Gunshot Wound [#]3 here.”  He testified that Exhibit 56, a photograph of the deceased’s liver, showed the bottom side of the liver and “where the bullet has come and gone through the left lobe here . . . before going through the chest wall.”

The admissibility of a photograph is within the trial court’s sound discretion.  
Paredes v. State
, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004).  We will not disturb a trial court’s ruling admitting evidence so long as its decision falls within the “zone of reasonable disagreement.”  
See Montgomery
, 810 S.W.2d at 391.  Under rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  
Tex. R. Evid. 
403.  A rule 403 analysis by the trial court should include, but is not limited to, the following considerations: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent’s need for the evidence.  
Erazo v. State
, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).  Here, after reducing the number of photographs sought to be admitted, the State established on voir dire with Dr. Rohr that the photographs would help him to describe the gunshot wounds and, aside from cause of death, would help the jury understand what condition the deceased arrived in, the range of fire of the wounds, what the wounds looked like, and “how [the gunshots] destroyed the kidney and the damage that was done to the liver.”  Appellant argued that because Dr. Rohr testified that he could explain the cause of death and where the gunshots went in and out without the photographs or his diagram, the remaining photos were highly prejudicial.

A court may consider the following nonexclusive factors in determining whether the probative value of a photograph is substantially outweighed by the danger of unfair prejudice: the number of photographs, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots, whether the body is naked or clothed, whether the body has been altered by autopsy, the availability of other means of proof, and other circumstances unique to the individual case.  
Erazo
, 144 S.W.3d at 489; 
Reese v. State
, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000); 
King v. State
, 189 S.W.3d 347, 355 (Tex. App.—Fort Worth 2006, no pet.).  Appellant complains of eight photographs.  These were all color photographs.  Two of the photographs showed the deceased’s face and upper chest, two showed the deceased’s naked body, two showed gunshot wounds close-up, one showed the deceased’s kidney, and one showed the deceased’s liver.

Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself.  
Rayford v. State
, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003), 
cert. denied
, 543 U.S. 823 (2004).  Where pictorial evidence will help the jury to understand verbal testimony, such as the technical language used by a medical doctor in describing the injuries sustained by a crime victim, the photograph is generally admissible.  
Harris v. State
, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983).  Photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect.  
Frank v. State
, 183 S.W.3d 63, 77-78 (Tex. App.—Fort Worth 2005, pet. ref’d); 
Legate v. State
, 52 S.W.3d 797, 807 (Tex. App.—San Antonio 2001, pet. ref’d).  Overall, the photograph must be helpful to the jury; “[i]f there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects.”  
Erazo
, 144 S.W.3d at 491-92.

Dr. Rohr stated that the autopsy photographs would help the jury understand in what condition the deceased arrived.  Exhibits 38 and 39 show abrasions to the deceased’s face and upper chest sustained before death, but are not particularly gruesome.  We cannot see, based on the record, and Appellant does not explain, how the probative value of Exhibits 38 and 39 in demonstrating the deceased’s condition and the nature, location, and extent of minor wounds sustained at or near the time of death was substantially outweighed by prejudice.
(footnote: 10)  
See Frank
, 183 S.W.3d at 78-79.  Therefore, we conclude that the trial court did not abuse its discretion in admitting these two exhibits.  
See Paredes
, 129 S.W.3d at 539.  Likewise, Appellant does not discuss how the probative value of Exhibits 44 and 47, each showing a close-up of an entry wound, soot, and the muzzle imprint of the weapon used, were substantially outweighed by prejudice, particularly in light of Dr. Rohr’s testimony that the presence of soot and muzzle imprints explained his conclusion that those two wounds were contact wounds.  
See id.
  The presence of contact wounds was significant in light of the testimony by Shalonda, Shontell, and the accomplices with regard to Appellant’s position near the deceased in the apartment.

Exhibits 40 and 41 depicted Appellant’s naked body on the autopsy table, with the clear autopsy tubes visible.  Dr. Rohr testified that Exhibit 40 displayed the entry wounds of gunshot wounds #2 and #3 and that Exhibit 41displayed the exit wounds of gunshot wounds #1 and #3.  Other than the presence of the clear tubing, there was no mutilation caused by the autopsy itself.  
See Rayford
, 125 S.W.3d at 529.  These exhibits depicted the nature, location, and extent of the gunshot wounds inflicted upon the deceased.  
See Frank
, 183 S.W.3d at 78-79.  Dr. Rohr testified, when asked why he considered this a homicide and not an accident, “[F]or one thing, there was more than one gunshot wound; there’s three.  And they’re on the back.  And it would be difficult to say that this was accidentally done.”  One element that the State had to prove was that the deceased’s death had been intentionally caused.  
See
 
Tex. Penal Code Ann. 
§§ 19.02(b)(1), 19.03(a)(2).

Appellant complains that the photographs were not helpful to explain the entrance and exit wounds, stating, “Dr. Rohr admitted when he described them[,] ‘Entry Wound [#]1 can barely be seen over on the shoulder here,’ . . . ‘barely see the exit for [#]1,’ [and] . . . ‘barely see the exit for [#]2 here.’” However Dr. Rohr also testified that, with regard to Exhibit 40, “it displays the Entry Wound [#]3 here, the Entry Wound [#]2 here,” and “we can see the exit for [#]1 clearly right here” as well as the exit for gunshot wound #3.

Although gruesome, Exhibits 40 and 41 depicted the reality of the offense and were probative of at least one element of the State’s case.  
See Erazo
, 144 S.W.3d at 491-92; 
see also Chamberlain v. State
, 998 S.W.2d 230, 232, 237 (Tex. Crim. App. 1999) (“Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions.”), 
cert. denied
, 528 U.S. 1082 (2000).  Therefore, we cannot say that the trial court abused its discretion by deciding that the probative value of Exhibits 40 and 41were not substantially outweighed by the danger of unfair prejudice. 

However, with regard to Exhibits 55 and 56, photographs of the deceased’s liver and kidney, we agree with Appellant that these two photographs were substantially more prejudicial than probative, and should not have been admitted.  Dr. Rohr explained to the trial court that the two photographs were useful to demonstrate “how [the gunshots] destroyed the kidney and the damage that was done to the liver.”  He testified before the jury that the third gunshot broke the right kidney in half and severed the renal artery, but did not describe how this damage led to the deceased’s demise.  We conclude that this evidence was substantially more prejudicial than probative because showing the jury photographs of the deceased’s internal organs, by themselves, without additional testimony, did nothing to depict the nature or location of the wound or to help the jury make its decision on an element of the charged offense when they had already seen the body and positioning of the gunshot wounds and heard Dr. Rohr’s testimony that the cause of death was multiple gunshot wounds.  
See Erazo
, 144 S.W.3d at 491-92; 
Frank
, 183 S.W.3d at 77-78.

Harm Analysis

Having found error with regard to the admission of Exhibits 55 and 56, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment.  
Tex. R. App. P. 
44.2.  We apply rule 44.2(b) to the erroneous admission of evidence and disregard the error if it did not affect Appellant’s substantial rights.  
Tex. R. App. P. 
44.2(b); 
see Mosley
, 983 S.W.2d at 259; 
Coggeshall v. State
, 961 S.W.2d 639, 642-43 (Tex. App.—Fort Worth 1998, pet. ref’d); 
see also Solomon
, 49 S.W.3d at 365 (“[S]ubstantial rights are not affected by the erroneous admission of evidence ‘if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.’”).  A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State
, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing
 Kotteakos v. United States
, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); 
Coggeshall
, 961 S.W.2d at 643.  In making this determination, we review the record as a whole.  
See Johnson v. State
, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

We have already examined the record for legal and factual sufficiency and concluded that there was sufficient evidence to convict Appellant of capital murder based on the witness and accomplice testimony discussed above and Dr. Rohr’s testimony that the deceased’s cause of death was a homicide, caused by three gunshot wounds.  Exhibits 55 and 56 were merely cumulative, as Dr. Rohr had already explained to the jury that gunshot #3 had broken the right kidney in half and struck the left lobe of the liver before the photographs of the violated organs were shown to the jury.  
See Long v. State
, 203 S.W.3d 352, 353 (Tex. Crim. App. 2006).  We conclude that, in the context of the entire case against Appellant, the trial court’s error in admitting Exhibits 55 and 56 did not have a substantial or injurious effect on the jury’s verdict and did not affect Appellant’s substantial rights.  
See King
, 953 S.W.2d at 271.  Thus, we disregard the error.  
See 
Tex. R. App. P
. 44.2(b).  We overrule Appellant’s second issue.

CONCLUSION

Having overruled all of Appellant’s issues, we affirm the trial court’s judgment.

DIXON W. HOLMAN

JUSTICE

PANEL A:  CAYCE, C.J.; HOLMAN AND MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  August 9, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
See
 
Tex. Penal Code Ann. 
§§ 19.02(b)(1), 19.03(a)(2) (Vernon 2005 & Supp. 2006). 

3:
A co-indictee for the same offense is an accomplice as a matter of law.  
Burns v. State
, 703 S.W.2d 649, 651 (Tex. Crim. App. 1985).  Both Keith and Kevin were charged with this capital murder.

4:
Shalonda Jones is also referred to in the testimony as “Shea,” her nickname.  Shontell Jones is also referred to in the testimony as “Nicole.”

5:
The deceased’s apartment is situated within the portion of the City of Dallas located within Denton County.

6:
Shalonda testified that Jason was a drug user and dealer and that she lived with him for several years before moving in with her sister and the deceased. She testified that the deceased had also sold drugs and that there were drugs in the apartment—marijuana and ecstasy.  She testified that she did not see Jason that night and described him as a white male, around six feet tall, 230 pounds, with short hair.

Detective Ermatinger testified that the deceased’s parents told him that Jason had threatened to kill the deceased and that a man named Derek witnessed it, but that he had never been able to substantiate that information.  He testified that Keith and Kevin told him that it was Jason’s idea but that Jason stayed with the car when the offense was committed.  He testified that Jason told him that Jason “thought they were going to jack [the deceased] or break into his house,” and that “they” meant Appellant, Keith, and two other guys.  He testified that he had no evidence that Jason had entered the apartment, that Jason is Caucasian, that it was stated that Jason asked if, in the melee, “his girl” got shot, and that his girl was one of the Jones sisters.  Officer Della testified that the radio call about the shooting “described three black males in a light-colored vehicle.”  Keith testified that he thought Jason’s car was a white Acura.

7:
Most of Appellant’s arguments discussing the facts of this case involve assertions that the eyewitnesses’ testimony was “not plausible” or “objectively believable.”  However, the jury had the opportunity to evaluate the witnesses’ testimony and to weigh all of the evidence presented before it, and we may not simply substitute our judgment for that of the jury.  
See Johnson
, 23 S.W.3d at 12.

8:
Appellant objected to Exhibits 38-41, 44, 47, 50, 52, 54-66 at trial.

9:
Dr. Rohr testified that the numbering he gave the wounds had nothing to do with the sequence in which they were sustained.

10:
Appellant does not actually discuss Exhibits 38 and 39, other than to state that Dr. Rohr was “probably reviewing Exhibits 36 through 39” in his discussion of Exhibit 36.